## Taylor's Appeal.

*What judgments are fraudulent as against creditors.*

F. and B. having drawn and endorsed accommodation paper for mutual benefit, each having given and received notes in like amount from the other, F. obtained from a firm, then insolvent, in fraud of their creditors, five judgment-notes, two to himself, two payable directly to B., and one to M. He then gave to B. those made to him, receiving from B. his (F.'s) own notes in return, while that payable to M. was received as collateral for the payment of notes given by F. to a firm, of which M. was a member, in exchange for their notes lent to him. On sheriff's sale of the property of the insolvent firm under executions issued upon the five judgments taken by F., the auditor appointed to distribute the proceeds, refused distribution on those held by him, but awarded it to his assignees, B. and M., as innocent holders for value. On appeal by subsequent execution-creditors, *Held,*

(1.) That although the judgments of the firm were made directly to B. and M., yet as they were not creditors of that firm, they could not be considered as direct promissees and entitled to recover irrespective of fraud on the part of F.:

(2.) That if they took as assignees they held subject to all equities existing

[*Taylor's Appeal.*]

in the obligors, the partners, each of whom, and their creditors through them, could object to the application of partnership assets to fraudulent judgments:

(3.) But that as F. had no assignable interest in the judgment-notes which he could enforce against the obligors, to the prejudice of firm creditors, his assignment passed no title:

(4.) That B. in giving up the promissory notes of F., on receiving the judgments, did not thereby pay a valuable consideration for them: for on the notes given by B. to F., and endorsed away by him, B., the surety as between them, would have, on payment, his action of *assumpsit* against F. for money paid to his use, and thus his right of recourse to F. was as good after the surrender of the notes as before:

(5.) That M. had given nothing for the judgment received by him, either by surrender or payment of the notes of F., for which it was received as collateral: nor could he claim to hold it as security from F., for each was the creditor of the other for like amounts: nor as a security given by the insolvent firm, for he had had no dealings with them but with F. solely:

(6.) That all the judgments tended alike to hinder, delay, and defraud the creditors of the firm obligors, and must be set aside in their favour, as well those standing in F.'s name as those he had assigned to B. and M. without consideration.

APPEAL from the District Court of *Philadelphia.*

This was an appeal by George E. Taylor from the judgment of the District Court for the city and county of Philadelphia, affirming the report of Charles Gibbons, the auditor appointed to distribute the proceeds of a sheriff's sale of the personal property of the firm of Meyer & Warne, who were manufacturers of plated ware, and carried on that business in Philadelphia for several years prior to the date of the executions hereafter mentioned.

Five judgments were entered by confession in the District Court against them upon sealed notes or bonds, as follows, viz:—

George Miller *v.* Meyer & Warne, D. C., D. S. B. M. 60,

|  |  |  |  | No. 92, for | $5000 |
|---|---|---|---|---|---|
| Samuel Battin *v.* | " | " | " | " 93, " | 5000 |
| Do. *v.* | " | " | " | " 94, " | 5000 |
| H. B. Fairman *v.* | " | " | " | " 109, " | 10,000 |
| Do. | " | " | " | " 114, " | 7000 |

Subsequent judgments were obtained against the defendants, among which is that of the appellant's firm, N. & G. Taylor. Upon all these judgments executions were issued, under which the defendant's personal property was sold by the sheriff; the executions upon the said five judgments being issued a few days prior to those of the subsequent judgment-creditors, the proceeds of sale were paid into court. N. & G. Taylor applied to the court below for an issue to try the question of the *bona fides* of said judgments. The auditor appointed to distribute the fund reported that the judgments of Henry B. Fairman were fraudulent and void as against the subsequent judgment-creditors, and that they should be excluded from any share of the fund. He re-

ported in favour of the judgments of Miller & Battin, and distributed the fund to them, and a small balance to the next judgment-creditor, Messrs. Trainor, Jones & Co.

The judgment-creditors subsequent to Fairman, claimed the whole fund, and denied the validity of the said five judgments, and contended they were all fraudulent and void. They alleged that the bonds upon which these judgments were entered, were given by Meyer & Warne, in pursuance of a conspiracy between said firm and H. B. Fairman, the object of which was to get the property of the appellants and others into their possession, and to screen it and the other effects of Meyer & Warne from creditors, and to convert the assets so obtained to their own use, by selling them cheap for cash—by enabling Fairman to levy—and by giving his friends and creditors liens thereon. The facts as proved before the auditor, and substantially reported by him, are as follows:—

Meyer & Warne were manufacturers of plated ware, and had a factory in Prune street and a store in Chestnut street, Philadelphia. In the regular prosecution of their business they had occasion for large quantities of pig tin.

At various times between September 1859 and March 1860, the said firm purchased on credit from N. & G. Taylor and others large quantities of pig tin, ostensibly for use in their business. It was delivered at their factory in Prune street. The purchases between the said dates mentioned amounted to upwards of $25,000. Under the fictitious or assumed name of J. B. Roeder this tin was from time to time shipped to New York by H. B. Fairman, or his firm, Fairman, Bowen & Co. (who were dry goods merchants), consigned to a Mr. Morris Richter (also a dry goods merchant), sold by him below the market price for cash, and the proceeds, amounting to about $20,000, remitted from time to time to Fairman or his firm. "Fairman requested Richter not to tell any one where the tin came from, and their proceedings were studiously concealed from the creditors of Meyer & Warne."

Other facts were proved tending to show a fraudulent combination.

While these transactions were going on Meyer & Warne gave to Fairman the five judgment-notes above mentioned.

Two of these, dated respectively January 9th and 10th 1860, for $10,000 and $7000, were made payable one day after date, to Fairman or his assigns. Two others, dated February 18th 1860, for $5000 each, were payable one day after date to Samuel Battin or assigns, and one of same tenor, date, and amount is made payable to George Miller or assigns.

The five judgments above mentioned were entered on these notes in favour of the respective payees, and execution issued as

above stated.   After Fairman got the notes he disposed of them
as follows :—

On the two payable to himself he entered judgment as above.

As to the Miller note the auditor reported that "Fairman had
borrowed for his own use the notes of Mr. Miller's firm, amount-
ing to $5168.34, and had given to the firm in exchange his own
notes for the same amount.   After this exchange of notes, and
before any of them matured, he obtained the judgment-note of
Meyer & Warne above mentioned, in favour of Miller for $5000,
and delivered it to him as security for the payment of his notes,
which Miller's firm then held.   Mr. Miller entered judgment on
Meyer & Warne's note on 17th March 1860, and issued his exe-
cution on same day, which was before any of the exchange notes
fell due."

As to the Battin notes the auditor reported that "Battin and
Fairman had been in the habit of exchanging notes, and each
held the notes of the other for $9600.   Fairman proposed to
give Battin in exchange and satisfaction of his (Fairman's) notes
for $9600, the two judgment-notes of Meyer & Warne above
mentioned for $5000 each.   The proposition was accepted by
Battin, who accordingly surrendered Fairman's notes to him, and
received the judgment-notes of Meyer & Warne."

On these, judgment was entered in the name of Battin, as
above.

The auditor reported as matter of fact that there was a collu-
sion between Fairman and Meyer & Warne to defraud the credit-
ors of the latter, and on that ground he rejected Fairman's claim
on the notes held by him.

He reported that "notes were given at a time when Fairman,
Bowen & Co. were receiving from New York large remittances
on account of the proceeds of the sale of the tin, purchased by
and delivered to the defendants, shipped to New York by Fair-
man, under an assumed name, and disposed of by his instructions
at prices less than could have been obtained for it in Philadel-
phia.   The amount remitted from that source to Fairman's house
was upwards of $20,000.   There was no attempt by Fairman to
explain these transactions, continued from September 1860 until
March 1861, or to account for the money.   They are too plainly
marked with fraud to be overlooked.   They indicate a deliberate
design on his part and that of the defendants to cheat the cre-
ditors of the latter, and they taint every other transaction in
which they were concerned, which could be used for a similar
purpose."   He was therefore of opinion that Fairman should
present very clear proof of consideration for the judgments,
and that, in the absence of such proof, his executions should
be set aside as fraudulent."   After referring to some evidence
by Fairman he added : "Your auditor is not satisfied with

this evidence.   He considers it incumbent on Fairman to make out a clear case, or at least to explain why he is unable to do it.

" He does neither the one nor the other, and stands mute when the fact is developed that between the 9th of September 1860 and the 1st of March 1861, he received upwards of $20,000 from the sale of property belonging to the defendants.   Your auditor is therefore of opinion that his executions should not stand in the way of subsequent execution-creditors, and reports that his claim in the fund ought not to be admitted."

In reference to the Miller & Battin notes, the auditor decided that the fraud of Fairman and Meyer & Warne did not affect them—that " there was nothing fraudulent on the part of Miller in accepting the judgment-notes of the defendant as security for the payment of notes loaned, or to be loaned, by him to Fairman. It does not appear that either Miller or Battin had any knowledge whatever of the transactions between Fairman and the defendants respecting the tin sent to and sold in New York.   Assuming them to have been fraudulent, or intended to defraud the business creditors of the defendants, the fraud cannot vitiate other transactions with other and innocent parties, who received the bonds or judgment-notes of the defendants from Fairman in good faith.   Your auditor does not think it material to inquire whether any money consideration for those judgments existed, as between the defendants and Miller & Battin."

Miller & Battin obtained their notes through Fairman, to whom they were given by Meyer & Warne in the first instance.

It did not appear that Meyer & Warne had any dealings or intercourse *directly* with Miller & Battin.   Also that the facts set forth in appellant's prayer for " an issue" were substantially proved.

The following exceptions were filed to the auditor's report :—

1. The auditor erred in not deciding that the judgments in favour of George Miller and Samuel Battin were fraudulent as against the subsequent creditors of Meyer & Warne, having been given to them by Henry B. Fairman in pursuance and as part of one plan or conspiracy between said parties to place property acquired by defendants apparently in conducting a legitimate business, out of the reach of their creditors, and to hinder and delay them, and in not distributing the fund in court without regard to said judgments.

2. The auditor erred in not deciding as in above exception mentioned, notwithstanding that he found the facts stated in the affidavit of Nathan Taylor praying for an issue, are substantially as reported by the auditor.

3. The auditor erred in reporting as a fact that Meyer & Warne chose to extinguish Fairman's liabilities to Miller & Battin by giving these judgments, whereas in fact Meyer & Warne had no dealings with either Miller or Battin, and the judgments

[Taylor's Appeal.]

were confessed to Fairman, and in pursuance of a fraudulent conspiracy as aforesaid, without any consideration whatever being given by either Miller or Battin.

The court affirmed the report of the auditor, and refused the issue prayed for. Whereupon this appeal was taken, and the following errors assigned :—

1. The court erred in awarding the fund to the judgments of Miller & Battin.

2. In not awarding the fund to the appellant and to the executions of the same and subsequent dates.

3. In refusing to award an issue as prayed for by the appellants.

*Fallon* and *Serrill*, for appellant.

*W. A. Porter* and *William Henry Rawle*, for appellees.

The opinion of the court was delivered May 6th 1863, by

WOODWARD, J.—The fund in court for distribution ($16,840), accrued from a sheriff's sale of the personal goods of Meyer & Warne, which was made at the instance of a large number of their execution-creditors, the aggregate of whose claims exceeds $70,000. It is impossible to learn from the auditor's report what were the dates and order of the several executions, or of the judgments upon which they were founded, but we understand that the five oldest judgments and executions were those of Miller, Battin, and Fairman, together amounting to $32,000. The appellant's counsel have exhibited these judgments, and the sealed notes on which they were entered.

They were assailed by the subsequent execution-creditors, of whom Taylor, the appellant, was one, on the ground that they were founded in no full and adequate consideration, but were collusive and fraudulent—given to delay, hinder, and defraud subsequent execution-creditors of Meyer & Warne, and to enable Fairman, as a confederate of theirs, to sweep the proceeds of their stock in trade into his own pocket. The execution of Trainer, Jones & Co. was issued on 26th March 1860, that of N. & G. Taylor on 27th March 1860, and several others on the same day; all of which, though received by the sheriff subsequent to those issued on the first five judgments alluded to above, were in his hands when the goods were levied and sold.

The general question was, therefore, whether the five prior liens should be set aside in favour of subsequent creditors. Subordinate to this question was another, whether Miller & Battin, if their claims be sustainable as against the subsequent creditors, should receive the money for their own use and that of their assignees, or whether it should go to certain banks and other creditors, who hold their paper endorsed by Fairman.

The auditor investigated the circumstances which preceded and attended the first five judgments, and found that the two which Fairman entered in his own name, amounting to $17,000, were plainly marked with fraud. "They indicate," says the auditor, "a deliberate design on his part and that of the defendants, to cheat the creditors of the latter, and they taint every other transaction in which they were concerned, which could be used for a similar purpose." The facts on which the auditor founds himself, and which, because sufficiently set forth in his report, I will not recite, do indeed reveal an odious fraud, little, if anything, short of grand larceny; and do abundantly justify the heavy condemnation he pronounced on the two notes in Fairman's name. But how do the other three notes escape the same condemnation? The two were dated January 10th 1860, and were made payable to Henry B. Fairman one day after date, one for $7000, the other for $10,000, with confession of judgment in each, and a waiver of all stay and exemption laws, and were signed and sealed by both partners of the firm of Meyer & Warne. The other three were dated February 18th 1860, and were drawn and signed in the same manner, except that one of them, for $5000, was made payable to George Miller, and two, for $5000 each, to Samuel Battin; the name of Fairman not appearing in either of these notes.

I infer from the testimony of Frederick C. Meyer, of the firm of Meyer & Warne, as reported by the auditor, that the five notes were given at the same time, on the eve of their bankruptcy, and given to Fairman for what the witness supposed the firm owed him. But no notes, accounts, or memoranda, were produced of dealings between the parties, and no evidence of any settlement at the date of the notes. The judgments were entered on these notes at the same time. Now, in view of the facts that these notes were all concocted at the same time, and given to the very man who had confederated with the drawers to cheat Taylor, Jones, and other creditors out of their property, it is hard to doubt that they were all given for the same guilty purpose, especially as there was no evidence explanatory of a different purpose in behalf of the three dated 18th February. Nor does the auditor seem to have had a doubt on this head, but he refused to condemn the three notes, because there was no evidence to connect Miller & Battin with the fraud. His language in respect to the three notes is, "assuming them to have been fraudulent, the fraud cannot vitiate other transactions with other and innocent parties who received the bonds or judgment-notes of the defendant from Fairman in good faith. Your auditor does not think it material to inquire whether any money consideration for these judgments existed as between the defendant and Miller & Battin. The former chose to extinguish Fairman's liabilities to the latter, and for that purpose they executed the judgment-notes; and they chose to become

sureties for the payment of Fairman's notes to Miller, and gave
their judgment-notes to him for that purpose. All this they
certainly had a right to do." And the learned judge, in affirm-
ing the auditor, refused to consider Miller & Battin in the light
of equitable assignees of Fairman, but as direct promisees of
Meyer & Warne, giving the man immediate legal title to the notes,
which was rendered not the less direct by coming through the
hands of Fairman, and which they, or those claiming under them,
are entitled to enforce, whether the allegation of fraud be true
or not.

It was in this manner the three notes escaped the condemna-
tion of their two guilty fellows, and were decreed to be paid out
of the fund in court. They were promises to two men who were
not privy to the base dealings between Fairman and Meyer &
Warne, and they were in the hands of men who received them
from Fairman for a valuable consideration rendered him, and who
were ignorant that he had procured them by fraud. These were
the grounds on which the court and its auditor gave the fund to
Miller & Battin, or their assignees.

The first objection to this ruling which strikes my mind, is the
artificialness of the presumption that the notes were engagements
by Meyer & Warne to Miller & Battin. I know how easy it is
to point to the terms of the notes, and to say that that is a
natural presumption which arises right out of the plain language
of written instruments. But this is to stick in the bark. We
are dealing with transactions that rooted themselves in a gross
fraud, and we must not be put off with the forms in which they
veiled themselves, but must look at them through and through,
as they really were in fact and truth, as well as in form and
manner. Lord Hardwicke hit this case and all of its class, by
his remark in Bridgman *v.* Green, 2 Ves. 627, that if a person
could get out of the reach of the doctrine and principle of this
court by giving interests to third persons instead of reserving
them to himself, it would be almost impossible ever to reach a
case of fraud. This observation was enlarged and emphasized
afterwards by Lord Commissioner Wilmot, when the same case
came before him : Wilmot's Notes 64.

Miller & Battin were not creditors of Meyer & Warne.
Whether they were creditors of Fairman shall be examined here-
after. But if they were creditors or accommodation drawers for
Fairman, there was no communication between them and Meyer
& Warne for security or indemnity. So far as the case shows,
they were strangers to Meyer & Warne—they never called on
that firm for judgment-notes—were not present when the notes
were made—never agreed to accept them. How then can it be
inferred that Meyer & Warne chose to extinguish Fairman's lia-
bilities to Battin, and that they chose to become sureties for the

payment of Fairman's notes to Miller, and gave their judgment-notes *to him* for that purpose? Or, in the language of the learned judge, that they "made a *direct* promise or engagement to Battin."

There is no ground for inferences so stated. Though the papers were drawn in the names of Miller & Battin, they were so drawn in *pursuit and execution of the ascertained and established fraudulent intent.* They were delivered to Fairman to do with as he pleased. The substance of the transaction was to place in his hands, at his instance, and for his use, $15,000 of judgments that could be employed in connection with the other two judgments in his own name, to divert the proceeds of their property from their honest creditors. Their promises were all made to Fairman. The form in which three of them were disguised was chosen the better to conceal the real intent.

Such was the unmistakeable visage which this case wore in its origin. What then was the effect of Fairman's handing over three of the notes to his creditors? Was it an assignment? A formal and legal assignment it surely was not, and I am strongly inclined to concur with the learned judge below, that it was not an equitable assignment. But let us look at it in the light of an assignment. If Miller & Battin took the notes by assignment, they held them subject to all equities existing in the obligors. Such was the precise mode of stating this rule of law in Norton *v.* Rose, 2 Wash. Rep. 233, and in Murray *v.* Lylburn, 2 Johns. Ch. Rep. 443. What were these equities? The obligors were partners in trade, and the only property they possessed were partnership goods. They were insolvent. Now each partner has an equitable right to have partnership goods applied to partnership debts, and the partnership creditor may avail himself of this right to compel such application. When he does so, it is called in the books the working out the equities of creditors through the partners. The creditors have no such equities of their own as will sustain them even in a court of equity, but the courts will extend to them the benefits of the equities which exist between the partners themselves. Thus each of these partners had a right to object to any of the partnership assets going to pay these three notes, because, instead of being debts of the partnership, they were debts of nobody—void and spurious counterfeits only—and their creditors could enforce this right. Miller & Battin, if assignees, took the notes, subject to this equity. But they might have defeated it by going to Meyer & Warne and inquiring if there was any defence, and it is argued that a direct acknowledgment of indebtedness to them is much stronger than any mere certificate of no set-off or defence. Perhaps so, if the direct acknowledgment had been obtained in answer to the inquiry which the law requires the assignee to make. But here

[Taylor's Appeal.]

there was no inquiry and no answer, and therefore the case falls not within the exception to the rule which subjects bonds and sealed notes in the hands of assignees to the equities of obligors, but is within the rule itself.

It is, however, impossible for me to conceive of an assignment where no assignable interest exists in the assignor. Fraud vitiates everything into which it enters. Fairman had nothing in these notes which he could enforce against Meyer & Warne, to the prejudice of their creditors, and therefore he had nothing to assign. Mere tradition of the notes could add nothing to their value. Fraudulent before delivery, they were worthless afterward, unless some rule of law will impute a value, not intrinsic, but accidental, as resulting out of a valuable consideration paid by *bonâ fide* holders, without notice of the original fraud that tainted them. And this brings me to the question of consideration. It is not pretended that any consideration moved from Miller & Battin to Meyer & Warne. And I agree that none was necessary; for the law, in protecting *bonâ fide* purchasers for value, regards the fact of a payment of consideration, rather than the party by whom it was received. If Meyer & Warne put sealed notes into the hands of Fairman, which he sold to Miller & Battin for a fair and valuable consideration rendered to him, it would avail them in the same manner as if that consideration had moved to Meyer & Warne.

We learn from the auditor's report that Fairman was in the habit of borrowing notes from Battin, and from Underkoffer & Co., through Miller, one of that firm, and of giving them his own notes in exchange. Let us first look at his transactions with Battin. On the 18th February 1860, the date of the two notes of Meyer & Warne to Battin, or on the 17th March 1860, the date of the entry of judgments on the notes (it is impossible to say which date the auditor means), the auditor states that Fairman and Battin held notes of each other for $9,600. The specification of Battin's notes, given by the auditor, exceeds that sum. For instance:—

| | |
|---|---:|
| The two notes paid by Battin, before his failure, amounted to | $2,600.00 |
| The three notes held by Manufacturers' & Mechanics' Bank | 4,700.00 |
| The one note held by Commonwealth Bank | 1,250.00 |
| The note held by Bank of Penn Township | 2,200.00 |
| And the note dated 9th December 1849, at 4 months | 1,638.41 |
| | $12,388.41 |
| If the note of 6th of March 1860, given possibly after the date intended by the auditor, be deducted | 2,200.00 |
| The balance would still be | $10,188.41 |

The discrepancy is unexplained, but very likely substitutions and renewals had taken place to reduce the aggregate to the

[Taylor's Appeal.]

round sum stated by the auditor, $9600. At any rate, we take his statement as the ascertained fact in the case. Then he tells us that Fairman proposed to give Battin in exchange and satisfaction of his (Fairman's) notes for $9600, the two judgment-notes of Meyer & Warne for $5000 each, and that the proposition was accepted by Battin, who accordingly surrendered Fairman's notes to him, and received the judgment-notes of Meyer & Warne. To put it in the strongest possible way for Battin, let us say that this was a purchase by him of two judgment-notes of $5000 each for $9600 of Fairman's paper, without notice of the fraudulent intent with which the judgment-notes had been made.

Was this the payment of a valuable consideration? Battin had received Fairman's notes in exchange for his own notes of like sums. Every one of his notes in Fairman's hands had to be endorsed by Fairman, and was held by the banks and others on the credit of both their names. Both were liable to the holders, and as to them and all other parties, Battin stood as principal debtor, and Fairman as his surety; but as between themselves, Fairman was the principal debtor, and Battin the surety. A surety may consent to stand as drawer as well as endorser, and whilst the law will treat them as sustaining the relations they have assumed on the paper they have issued, equity will, in adjusting their mutual rights and liabilities as between themselves, look at the essential truth of their relation, and make him who really is the principal debtor indemnify him who really is the surety. Therefore it was, that for every one of his notes given to Fairman, and endorsed away by the latter, which Battin might be compelled to pay, he would have his equitable action of *assumpsit* against Fairman for so much money paid to his use. Thus his right of recourse to Fairman was as good after he had surrendered Fairman's notes as before. Had he retained them, he could not have sued on them until he had paid his own, but not retaining them, he could sue for his money as soon as he had paid his own notes or any of them. In other words, by surrendering Fairman's notes, he gave up nothing of legal substance or value; at most, a mere convenience in pleading in an action of *assumpsit*. The auditor does, indeed, say that by this transaction Fairman's liability to Battin "was entirely extinguished;" but he puts it as a legal conclusion, and as such it was a mistake. There was no extinguishment of Fairman's liability to indemnify his accommodation drawer. Accommodation paper, said Judge Rogers, in Appleton *v.* Donaldson, 3 Barr 386, is a loan of the credit of the maker, to the extent of the value of the note, for the benefit of the payee, without restriction. Battin's return of Fairman's loan to him could not of itself extinguish Fairman's liability to return what *he* had borrowed, or else to compensate the lender.

9 Wr.—6

If it be said that Battin held the judgment-notes to be applied to the taking up of his own notes which Fairman had negotiated, this would let in the holders of these notes to take the fund, but then it would be apparent that the debts paid were Fairman's own debts, in respect of which he was principal, and not surety, and thus we should complete his fraudulent scheme to take away the property of Meyer & Warne from their creditors, and give it to his creditors. That would be bad enough; but what is worse, is to allow him to take away that property, and give it to a surety who has not fulfilled his suretyship. If Battin had paid the holders of his notes, he would have more equity than he has; but, standing as he claims to stand, and as both the court and auditor regarded him, not as trustee of the judgment-notes for the benefit of Fairman's creditors, but as absolute and exclusive owner of them, he stands on his mere legal title, without a particle of equity, except such as springs from the consideration he paid; what that was I have already shown. It was scarcely more than moonshine.

If, therefore, we give him the benefit of that principle of law which protects *bonâ fide* purchasers of fraudulent paper, from respect to the valuable consideration they innocently pay, he fails for want of showing that he paid a valuable consideration. It may be said that he might have negotiated Fairman's notes, if he had not given them up. True, but then he would have had to endorse them, and thus pledge his own liability to their full extent. The disastrous insolvency of Fairman shows how completely this liability would have cancelled the advantages of possessing such notes. He was just as well off after he parted with them as before, and therefore he gave nothing for the judgment-notes he got.

Next, as to the notes delivered to Miller. The auditor finds that they were delivered by Fairman as security for the payment of his notes, which Miller's firm then held. None of Fairman's notes were given up, and no extension of credit, in any form whatever, was agreed upon. Here, then, it cannot be pretended that a valuable consideration passed. But, says the learned judge, "security may be accepted by a creditor from any and every one who is willing to secure him from loss by the debtor, without responsibility for the means by which the principal has obtained, or the motives which have induced the surety to offer it." This was to assume, first, that Miller and his firm were creditors of Fairman, whereas, at the time the judgment-note came to their hands they had not paid a dollar for him, and held his notes for the same sums in which they had lent him theirs; and next, that Meyer & Warne offered their note as security, whereas no communication whatever is shown to have taken place between them and Miller. Both assumptions are wholly

[Taylor's Appeal.]

gratuitous. Fairman was the creditor of Miller in exactly the same sense as Miller can be said to have been a creditor of Fairman. The truth is, neither was the creditor party, or else both were. They had exchanged notes. Presumptively, the notes were of equivalent values. To place securities in Miller's hands to pay his notes which Fairman had negotiated, was all the same as if Fairman had collected the securities and paid the notes himself. It was, indeed, a mode of covering up his application of other people's assets to his own use, but it was as real an appropriation of them to his own use as if it had been done openly and directly.

In answer to the other assumption, I may refer to what I have before said, that while the judgment-note was in form a direct engagement to Miller, it was so only in form. The contract of Meyer & Warne was with Fairman, and not with Miller.

The law in this state is settled, that although the taking of the note of a third person as collateral security for a pre-existing debt, without more, will not place the taker in the situation of a holder for value, so as to protect him against the equities existing in the maker; yet it is otherwise if there is a new and distinct consideration, as if time be given in consideration of obtaining the new security: Duprau v. Waddington, 6 Wh. 220; Petrie v. Clark, 11 S. & R. 377; Root v. French, 13 Wend. 570.

Here there was neither pre-existing debt nor a new consideration, and therefore the judgment-note in Miller's hands was just as vulnerable as if it had remained in Fairman's.

The conclusion which we reach is, that all the judgment-notes ought to share the same fate. They were all conceived and brought forth to hinder, delay, and defraud the just creditors of Meyer & Warne. It was very proper to set aside the two which Fairman retained in his hands, but on the same ground on which they were set aside, the other three which he transferred to Miller & Battin without consideration, should also have been taken out of the way of the creditors.

And now, to wit, May 6th 1863, after hearing counsel and full consideration of this cause, the decree is reversed, in so far as it made distribution to George Miller, for the firm of Underkoffer & Co., to Vattatine & Co., and to George W. Schrack, assignee of Samuel Battin; and the fund in court is ordered to be paid to the subsequent execution-creditors of Meyer & Warne, according to the order of their liens; and the appellees are ordered to pay the costs of this appeal.